**KREGLINGER & FERNAU (New Zealand) Ltd.**

v.

**CHARLES J. WEBB SONS CO., Inc.**

Civ. A. No. 18313.

United States District Court
E. D. Pennsylvania.

Aug. 1, 1957.

Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff.

J. Wesley McWilliams, Philadelphia, Pa., for defendant.

KIRKPATRICK, Chief Judge.

This case, tried to the Court without a jury, is an action for damages by a New Zealand seller against a Philadelphia buyer, arising out of the latter's re-fusal to accept and pay for 100 bales of wool, the subject of a contract of sale. The defense is the failure of the seller to deliver the wool on board ship in New Zealand within 30 days. The issue is whether the contract of sale which called for "prompt" shipment means shipment within 30 days and, if not, whether the delivery was "prompt", as that term applied to New Zealand wool shipments at the time.

The parties' requests for findings are very complete and the Court's answers cover all the material facts so that it will be unnecessary in this opinion to do more than briefly touch upon them.

The contract was made in Philadelphia on February 27, 1951. At that time all New Zealand ports were strikebound by labor troubles which had been going on in the form of a number of local strikes of short duration for a year or more and which on February 19 developed into a nationwide work stoppage. At the time the contract was made both parties were fully aware of the existence and extent of the strike. It was discussed, and the seller's representative remarked that he had been advised by his "people" in New Zealand that the strike would be over very shortly. With this background, the word "prompt" was used at the seller's suggestion to designate the time for shipment.

The contract provided that the buyer would furnish an irrevocable letter of credit against bills of lading at any New Zealand port but did not set any term for the credit. Four days later the defendant-buyer arranged for a letter of credit which, by its terms, expired on March 31. The plaintiff-seller had not been notified and there had been no agreement as to what the term of the credit should be, but the plaintiff received the letter of credit without comment.

The wool was loaded at two separate ports in New Zealand, the last date being April 20. On its arrival in Philadelphia, the defendant refused to accept it and after rather protracted negotiations in an attempt to settle the matter without

litigation, the plaintiff sold it, on October 21.

The whole controversy centers around the single question, What did the parties intend when they inserted the word "prompt" in the contract?

■ Each side attempted to prove the mutual intention by calling evidence intended to establish the existence of a usage in the wool trade which gave a special meaning to the word. The plaintiff contended that it was generally accepted as meaning "by the first available ship", the defendant, as meaning "30 days". Neither party has satisfied me by the measure of proof required by the law of Pennsylvania of the existence of the trade custom or usage for which it contends [1] and I must endeavor to find the intention of the parties from all the circumstances surrounding their agreement, without reference to custom or usage.

■ It seems to me quite clear that the plaintiff, in the discussion at the time the contract was made, definitely took the risk of the strike preventing it from making what would be the usual prompt delivery, as that term was understood and used in normal times—a fact which eliminates the strike as a consideration and leaves what would have been prompt delivery had the situation not been complicated by a strike. The actual time was 52 days.

The plaintiff has called my attention to a decision which is in no way dispositive of the present case but which dealt with the word "prompt" in a contract and is a good statement of the considerations which should guide the Court in ascertaining the intention of the parties in using it. "Neither word ("rush" or "prompt") has, as far as the finding goes, any precise or definite meaning in the connection in which it was used in this instance. Both undoubtedly require something more than ordinary diligence, but their significance in a given case can only be determined in view of the terms and subject-matter of the contract and the surrounding circumstances * * * the trial court concludes that the failure of the plaintiff to ship the lumber more promptly was almost wholly due to various embargoes existing upon the railroads over which the lumber was to be carried, and to the inability of the plaintiff in the exercise of reasonable diligence to secure suitable cars, and that the shipments were made with reasonable promptness in view of existing circumstances. These conclusions we cannot find to be so insupportable in the light of the other facts found as to be erroneous * * *". Boston Lumber Co. v.

---

1. The evidence adduced by the plaintiff as to custom or usage did not convince me of the existence of such a trade custom in the accepted legal sense of the words, as distinguished from the conditions affecting shipments from New Zealand, the existence of which was well known throughout the wool trade and which must be taken into account in determining what the parties meant when they used the term. However, it will be seen that the conclusion reached in this opinion places the actual meaning of the term not very far from what the plaintiff attempted to prove as to trade custom. Certainly, any standard of diligence would be met by shipment by the first available steamer. It appears that no ship was available to take wool shipments at Bluff and Timaru before the Ottawa Valley on which the wool was shipped.

As to the defendant's evidence, the analysis of sales contracts, with reference to letters of credit and shipment dates, discussed later in the opinion, makes it utterly impossible for me to accept the testimony of the witnesses called by the defendant to prove a custom. There simply cannot be a custom which nobody follows, and the only evidence in the case having to do with actual practice (the analysis referred to) shows to all intents and purposes that nobody ever observed or paid any attention to any 30-day requirement in "prompt" contracts. It should also be noted that in the course of the negotiations, after the letter of credit was cancelled, during which each party was attempting to state his position as fully and forcefully as possible, neither of them so much as mentioned the existence of any custom or usage such as they contended for at the trial.

Pendleton Bros., Inc., 102 Conn. 626, 129 A. 782, 784.

It must be kept in mind that this was a shipment from New Zealand and that shipping facilities in New Zealand, in perfectly normal times, were and had been for a long time "notoriously irregular"[2] and that, for that reason, what would be considered prompt in Philadelphia, or even in Australia, would not be the standard by which shipments from New Zealand are to be judged.

The plaintiff produced an analysis of a number of contracts calling for "prompt" shipment of wool from New Zealand, a study of which is illuminating upon the question of what the trade generally accepted as fulfilling that requirement. In all of them, of course, Kreglinger was the seller but the contracts were made with more than 30 different buyers or importers in the principal centers of the wool trade on the east coast, so that it would seem to fairly cover the trade.

Taking the period between August 19, 1949, and ending February 19, 1951, (the last loading date before the strike began) in order to eliminate the unusual strike situation and to get a fair idea of the accepted practice under normal conditions, it appears that the word "prompt" was used in 69 out of 155 contracts and in only 27 of the 69 was the shipment made within 30 days and, what is more significant, in only one was the letter of credit for a period as short as 31 days. It thus appears that on 67 occasions some 25 buyers who had ordered wool for prompt shipment, bound themselves irrevocably to pay for it if shipped anywhere from 32 to 190 days. In 9 contracts it was 32 to 40 days. In 8

it was 41 to 52 and in 50 it was over 52 days—the number of days between the contract and the shipment of the wool in this case.

It seems to me that only one conclusion can be drawn from the evidence of this analysis, namely, that the word "prompt" in New Zealand wool contracts has no relation to any specific number of days allowed the seller to make shipment. It seems to have been a word inserted in all contracts where neither the specific date was fixed nor a ship designated. If it has any meaning at all it would seem to be equivalent to "without undue delay" or possibly, as the Court, in the Connecticut case cited, held, something more than ordinary diligence, a standard to be determined from the circumstances which condition the seller's ability to make shipment. Leaving the strike out of consideration altogether, I am satisfied that, taking into account shipping facilities from New Zealand, the trade generally would have accepted, in normal times, 52 days as prompt shipment, and both parties with their wide experience in the wool business must have known what the trade considered prompt. I think that the plaintiff acted without undue delay and shipped within a reasonable time. It follows that the plaintiff in this case complied with the terms of the contract.

■ The defendant insists that, regardless of custom or the usually accepted meaning of the term, the letter of credit establishes a construction by the parties themselves of the term "prompt" as meaning "on or before March 31, 1951",— the expiration date of the credit. The letter of credit had to do en-

2. There were eight ports in New Zealand from which wool was shipped. There was only one line which carried wool to the United States. I accept the following testimony as correctly describing conditions of shipment: "Steamers go to New Zealand, pick up wool at one port and if they have some space left over they go to the next port, and so on. When they finally have filled up their vessel they set sail for the States. At the time the wools in question were being shipped, and prior to that time, say for a year or two prior to that time, the service was even worse then than it is today * * * the number of steamers was very limited out of New Zealand * * * it was known throughout the trade that New Zealand shipping was poor, and if you bought wools out of New Zealand you would hope to get them shipped within a rapid period of time but very often it took much longer and everybody knew it."

tirely with the time and method of payment. It was intended to secure the price to the buyer as soon as the wool was loaded. It was not intended to affect the obligation of the seller to ship in accordance with the terms of the contract, or to relieve the buyer of the obligation to pay for the wool in some manner if the seller complied with the requirement of the contract as to delivery.

The expiration date of the letter of credit was inserted unilaterally by the defendant without prior agreement or even discussion with the seller. The fact that the plaintiff merely received the letter of credit, without protest, does not, in my opinion, prove that it was willing to write March 31 into the contract as the date for shipment. It appears that it was a very widespread practice for buyers, under similar circumstances, to renew letters of credit when it appeared that shipment could not be made before the expiration date of the letter, although within the terms of the seller's contract. As a practical matter there was no real necessity for Kreglinger to take any action upon receipt of Webb's letter of credit. In view of the way the business was commonly conducted it was not placing an interpretation on the contract when it merely awaited the event to see whether a renewal would be required.

The plaintiff is, therefore, entitled to recover damages in this action.

■■ As to the measure of damages. The ordinary rule, of course, is that an unpaid seller is entitled to the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted. At the time the defendant rejected the goods, it can hardly be disputed that there was no market for wool in New Zealand. The plaintiff was entirely justified in shipping the wool to Philadelphia where, although the market had broken, it still could be sold. As the Court in Moody v. McTaggart, 29 Pa. Super. 465, 469, said "What the plaintiffs did was evidently in the interest,

and for the benefit, of the defendants, and we know of no legal ground or principle of equity on which they will be heard to successfully claim that the plaintiffs should have sued them for the entire purchase price of the cargo of coke rather than for the amount which remained after deducting the amount for which they were enabled to sell it in the best market, at the best price obtainable."

The only question is whether, after the wool arrived in Philadelphia, the plaintiff's holding it without reselling, until October 21, was unreasonable under all the circumstances.

■ The wool was unloaded in Philadelphia on July 10. The plaintiff demanded payment from the defendant and the defendant refused. The defendant throughout had refused, though wrongfully, to pay for the wool. Its president did, however, state that the matter should be held in abeyance and that, if Kreglinger could show him that the majority of persons who had wool delayed by the strike were accepting it, he would, if they were similarly situated, reconsider his refusal and accept the wool. By the time the wool arrived in Philadelphia, the plaintiff was in a position to present such facts as it had concerning the action of other wool buyers to the defendant. The fact is that the defendant was the only buyer who purchased from the plaintiff while the strike was in progress and, had the plaintiff disclosed this fact to the defendant, no doubt the defendant would have been able to give the plaintiff a definite refusal much earlier in the negotiations. However, whether the defendant's default be regarded as occurring March 31, the date of Webb's letter, or on April 20, the date that loading was completed, or July 10, the day the wool arrived in this country, is of little moment since, as previously stated, the plaintiff was amply justified in bringing the wool from a place where there was no market to a place where there was one. The market value for

the wool on July 10 was $1.48.[3] The additional three months delay on the part of the plaintiff before selling the wool was, I believe, unjustified. The negotiations between the plaintiff and the defendant by July 10 had reached the point where they amounted to little more than the plaintiff's demanding that the defendant accept the wool and the defendant's refusal to do so. Furthermore, the plaintiff failed to disclose to the defendant the one fact which I cannot but feel would have made the defendant's refusal final. I, therefore, conclude that the plaintiff is entitled to recover from the defendant the difference between the contract price and the market price on July 10 of $1.48, together with necessary expenses incurred up to that date.

An order may be submitted in accordance with this opinion.

3. The plaintiff could have been allowed a reasonable time to sell after unloading the wool in Philadelphia, but there is no evidence that the price of wool two or three weeks later than July 10 was any different from what it was on that date.